IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-HC-2250-D

| | |
|---|---|
| THOMAS F. CROSS, JR., )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>JOSEPH B. HALL, )<br>)<br>Respondent. ) | **ORDER** |

On November 15, 2010, Thomas F. Cross, Jr. ("Cross" or "petitioner"), a state inmate, petitioned the court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [D.E. 1]. Cross seeks leave to proceed in forma pauperis [D.E. 2]. On January 7, 2011, Cross filed a motion for writ of mandamus [D.E. 3]. On May 19, 2011, Cross filed a motion for information, which seeks "the mailing address of the Office of the Clerk of the United Nations World Court" [D.E. 4].

Under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, the court must dismiss any petition if it "plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The court may sua sponte dismiss a section 2254 petition without notice if "it is indisputably clear from the materials presented to the district court that the petition is untimely and cannot be salvaged by equitable tolling principles or any of the circumstances enumerated in § 2244(d)(1)." Hill v. Braxton, 277 F.3d 701, 707 (4th Cir. 2002); see Eriline Co. S.A. v. Johnson, 440 F.3d 648, 656 (4th Cir. 2006). As explained below, the court dismisses the petition as untimely and denies Cross's motions as moot.

I.

On March 7, 1994, a jury convicted Cross of first-degree kidnapping, common-law robbery, assault with deadly weapon inflicting serious injury, and nine counts of obtaining property by false pretense. Pet. 1. The North Carolina Supreme Court summarized Cross's criminal case as follows:

> At trial, the State's evidence tended to show that Nancy White, the victim, arrived at the Crabtree Sheraton Hotel in Raleigh, North Carolina, on Friday, 22 October 1993. White parked her automobile in the hotel's left side parking lot. After retrieving her luggage from the trunk, White locked her car and checked into the hotel. None of the doors, except the driver's door, were opened at that time. White checked out of the hotel on the morning of Sunday, 24 October 1993. During her stay, White did not move her car, place anything in her car or take anything out of her car.
>
> As White loaded her luggage into the trunk of her car, a man passed between her vehicle and an adjacent vehicle. White testified that she "glanced up for a split second and back down again because he was moving fast, he was walking swiftly and just went by." A few seconds later, White glanced down and noticed the shadow of a person approaching from behind. White testified that before she could react, the individual grabbed her arms and said, "get in the car." When White refused, she was thrown face down between the parked automobiles and beaten on her back and on the back of her head. The assailant obtained White's car keys, opened both the front and rear doors on the driver's side of the car, forced White into the backseat and got behind the wheel. The assailant then reached back with his right hand; grabbed White's hair, causing her head to be pulled back "at a very awkward angle"; and threatened to cut White's throat if she did not remain quiet. The assailant began driving.
>
> After some time had passed, the assailant let go of White's hair and told her not to move and not to look at him. The assailant handed White some cards from White's wallet and demanded that she give him a bank card. White surrendered her ATM card and her access code. The assailant made numerous stops for money. Eventually, White heard the car being driven over gravel. The assailant stopped the car, cut the motor off and left. White then drove her automobile until she located a police officer and reported the incident.
>
> A review of White's bank records revealed nine attempted ATM withdrawals from White's account on 24 October 1993. The assailant was able to withdraw one hundred dollars on three separate occasions. His other attempted withdrawals were unsuccessful.

2

> Although White was unable to see her assailant clearly because her glasses had fallen off at some point during the attack, she described him to the best of her ability and assisted the police in the creation of a composite sketch. Defendant was subsequently arrested and fingerprinted. At the time of his arrest, the defendant was found hiding from police in an apartment near the location where the assailant had abandoned White's car. Defendant had also shaved his head and repeatedly denied that his name was Cross.
>
> At trial, White could neither identify nor eliminate the defendant as the person who attacked her. White did state that the defendant fit the general description and appearance of the person who committed the crimes.
>
> Agent Ken Duke of the City/County Bureau of Identification testified that he processed White's vehicle for latent fingerprints across the trunk and along the vehicle doors. He also processed various items left inside the vehicle. Agent Duke was able to locate four latent prints, three on the vehicle and one on White's driver's license. One of the prints found was a partial latent print lifted off the left (driver's side) rear door on the very rear edge of the door.
>
> Agent Joseph Ludas, a latent print examiner with the City/County Bureau of Identification and an expert in the field of fingerprint identification, identified the fingerprint taken from the left rear door of White's vehicle as corresponding to the right index finger of the defendant. Agent Ludas testified that the defendant's finger contacted White's car on the edge of the left rear door in a twisting, turning motion. Agent Ludas also testified that the ridge detail, due to its darkness and width, indicated that the defendant used a lot of pressure when he left the print on the vehicle. The remaining three prints were of "poor quality" and could not be identified.
>
> Prior to the weekend of the attack, White's vehicle had never been in Raleigh. Defendant had never been a guest in her vehicle, and White did not know of any period of time when defendant would have been around her vehicle.
>
> At the close of the State's evidence, [Cross] moved to dismiss the charges based on the insufficiency of the evidence. The trial court denied [Cross]'s motion, the jury returned verdicts of guilty, and [Cross] appealed. The Court of Appeals reversed the trial court, holding that there was insufficient evidence to show that [Cross]'s fingerprint, which was the only evidence tending to prove [Cross] committed the crimes charged, could only have been impressed at the time the crimes were committed.

State v. Cross, 345 N.C. 713, 714–16, 483 S.E.2d 432, 433–34 (1997); see Pet. 1, 3, 5. The State appealed, and the North Carolina Supreme Court reversed the Court of Appeals, finding that

3

"additional pieces of corroborating evidence . . . ., combined with the fingerprint evidence, supports a reasonable inference of [Cross]'s guilt and further makes it clear that the trial court correctly sent the case to the jury." Id. at 718–19, 483 S.E.2d at 435–36. Cross did not file a petition for writ of certiorari in the United States Supreme Court. Pet. 2.

On July 16, 2010, Cross filed a motion for appropriate relief ("MAR") in Wake County Superior Court. Pet. 3. On August 16, 2010, the MAR court denied relief. Id. Cross appealed to the North Carolina Court of Appeals, and further to the North Carolina Supreme Court, which dismissed the appeal on November 4, 2010. State v. Cross, 703 S.E.2d 737 (N.C. 2010). At some point, Cross also filed a writ of mandamus in Wake County Superior Court, and on March 19, 2009, the North Carolina Court of Appeals denied the writ. State v. Cross, 675 S.E.2d 662 (N.C. Ct. App. 2009).

In his petition, Cross asserts that he is innocent, and makes two claims. First, Cross challenges the admission into evidence at trial of "an [irrelevant] latent fingerprint lift of petitioner's right index finger, corresponding latent lift testimony as well as lift expert testimony." Pet. 5. Although Cross states that he did not directly appeal this issue because appellate "counsel failed to assign [the] issue as error," id. at 5, the fingerprint evidence was the focus of Cross's direct appeal. Second, Cross asserts that the "prosecutor illicited [sic] prejudicial testimony from petitioner's parole officer stating that petitioner was at the Sheraton Hotel and was involved in the crime from reliable information he received from an informant." Id. at 6. Cross states that he raised the issue in both his direct appeal and in his MAR. Id. at 7.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that a person in custody pursuant to the judgment of a state court file any application for a writ of habeas

4

corpus within a one-year period of the latest of certain dates. 28 U.S.C. § 2244(d)(1); see Frasch v. Peguese, 414 F.3d 518, 521 (4th Cir. 2005). The limitation period begins running from the latest of the following:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D).

The limitation period under section 2244(d)(1) is tolled during the time "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); see Taylor v. Lee, 186 F.3d 557, 560 (4th Cir. 1999). An application for post-conviction or other collateral review is "pending" from initial filing in the state courts until final disposition in the state courts. Taylor, 186 F.3d at 561. The period between the time a petitioner's conviction becomes final and the time that a petitioner files a state application for post-conviction relief counts against the one-year period of limitation. See, e.g., Hernandez v. Caldwell, 225 F.3d 435, 438 (4th Cir. 2000); Harris v. Hutchinson, 209 F.3d 325, 327 (4th Cir. 2000); Flanagan v. Johnson, 154 F.3d 196, 199 n.1 (5th Cir. 1998). The statutory period then resumes after the state court of appeals denies a petitioner's certiorari petition. See, e.g., Hernandez, 225 F.3d at 438.

5

Subsection (A) of section 2244(d)(1) requires the court to determine when petitioner's judgment became final. Because Cross failed to seek further direct review to the United States Supreme Court, his conviction became final no later than July 10, 1997, 90 days after the North Carolina Supreme Court affirmed Cross's convictions. See, e.g., Clay v. United States, 537 U.S. 522, 527 (2003). Thus, Cross's one-year period of limitations began to run on July 10, 1997, and ran for 365 days until it expired on July 10, 1998. See, e.g., Minter v. Beck, 230 F.3d 663, 665 (4th Cir. 2000). Cross failed to meet this deadline, and his July 16, 2010 MAR did not serve to reopen his time for filing a habeas petition. See id. Therefore, Cross's limitations period expired on July 10, 1998. Accordingly, absent equitable tolling, Cross's November 15, 2010 petition is untimely.

Under the AEDPA, the one-year statute of limitations is subject to equitable tolling. Holland v. Florida, 130 S. Ct. 2549, 2560–62 (2010). Equitable tolling applies only if a petitioner shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at 2562 (quotation omitted); Green v. Johnson, 515 F.3d 290, 304 (4th Cir. 2008). A court may allow equitable tolling under section 2244 in those "rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Green, 515 F.3d at 304 (quotations omitted); see Jackson v. Kelly, Nos. 10-1, 10-3, 2011 WL 1534571, at *11 (4th Cir. Apr. 25, 2011). However, "any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." Harris, 209 F.3d at 330.

Unfamiliarity with the legal process, lack of representation, or even illiteracy do not constitute grounds for equitable tolling. See, e.g., United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004); Harris, 209 F.3d at 330–31 (collecting cases); Turner v. Johnson, 177 F.3d 390, 392 (5th Cir.

6

1999) (per curiam). Likewise, a mistake of counsel does not serve as a ground for equitable tolling. See, e.g., Harris, 209 F.3d at 330–31.

Cross acknowledges that his petition is untimely, but "is claiming that he is actually innocent." Pet. 13. Although the Fourth Circuit has not addressed whether a claim of actual innocence can equitably toll the limitations period, the majority of circuits that have addressed the issue have concluded that a claim of actual innocence does not excuse the petitioner's failure to comply with the statute of limitations. See Lee v. Lampert, 610 F.3d 1125, 1134 (9th Cir. 2010) (collecting cases).

"Claims of actual innocence, whether presented as freestanding ones, . . . or merely as gateways to excuse a procedural default, . . . should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) (citations omitted). Accordingly,

> prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. This formulation . . . ensures that petitioner's case is truly extraordinary, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice . . . . [Thus,] a gateway claim requires new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial, . . . . [and] the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.

House v. Bell, 547 U.S. 518, 537–38 (2006) (quotations and citations omitted); see Sharpe v. Bell, 593 F.3d 372, 377 (4th Cir. 2010).

Cross presents no new evidence in support of his conclusory assertion of innocence. Rather, he bases his claim on having "review[ed] his transcript and discover[ed] all evidence submitted in his criminal case was improper and irrelevant." Mot. Writ Mandamus 1. Additionally, Cross's two grounds for relief challenge only the admissibility of the evidence against him at trial.

7

Simply put, Cross has failed to show extraordinary circumstances necessary for equitable tolling of the limitation period. Therefore, Cross's November 15, 2010 petition is dismissed as time-barred.

III.

As explained above, petitioner's application for habeas corpus relief [D.E. 1] is DISMISSED. Petitioner's motions for writ of mandamus [D.E. 3] and information [D.E. 4] are DENIED AS MOOT. The Clerk of Court is DIRECTED to close this case.

SO ORDERED. This **25** day of July 2011.

JAMES C. DEVER III
United States District Judge